J-S52002-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| TORY KELLY, | |
| Appellant | No. 1436 WDA 2013 |

Appeal from the Judgment of Sentence April 2, 2013
In the Court of Common Pleas of Allegheny County
Criminal Division at No(s): CP-02-CR-0001057-2012

BEFORE: SHOGAN, OLSON, and WECHT, JJ.

MEMORANDUM BY SHOGAN, J.:                    **FILED SEPTEMBER 25, 2015**

Appellant, Tory Kelly, appeals from the judgment of sentence entered April 2, 2013, in the Court of Common Pleas of Allegheny County. We affirm.

The convictions in this case result from incidents occurring at the State Correctional Institution Pittsburgh ("SCIP"). Agent Gary Hiler ("Hiler"), a criminal investigator for the Pennsylvania Department of Corrections ("DOC"), Office of Special Investigations and Intelligence ("OSII"), was assigned to investigate allegations of abuse at SCIP based on a complaint lodged by inmate Jerry Shoemaker. N.T., 12/17/12, Vol. II, at 18-20. The abuse allegedly occurred on a housing unit designated "F-Block" at SCIP, which is an intake assessment block for new inductees into the DOC from western Pennsylvania. *Id.* at 22. The average stay in F-Block was about 10

days before an inmate was transferred to SCI-Camp Hill for further assessment. *Id.* at 23-24. Hiler's investigation focused primarily on the 2:00 pm to 10:00 pm shift of SCIP employees from December 1, 2010 through January 7, 2011. *Id.* at 28-29.

Several hundred interviews were conducted of inmates at correctional institutions across the state. *Id.* at 31. Hiler testified that the inmates interviewed indicated that the abuse was primarily directed at inmates who were convicted of sex offenses against minors. *Id.* Some inmates refused to cooperate, or did not have any information. *Id.* at 32. The inmates were not offered anything in exchange for their testimony. *Id.*

Appellant was employed at SCIP during the period of time at issue and was assigned as a utility officer[1] during the shifts and dates in question. *Id.* at 30. Although Appellant did not perform normal routine duties in F-Block, he could have been assigned to a task requiring his presence in F-Block. *Id.* at 55-57. Based on Hiler's investigation, there were four alleged victims in Appellant's case: Steven Friend, William Zuschlag, Arthur James Turner, and Randy Jones. *Id.* at 33-37. The convictions at issue in the instant appeal concern allegations of abuse by Appellant against inmate Randy

_____

[1] Hiler explained that six to eight "utility officers" were given miscellaneous job assignments throughout the shift, responding to the various needs of the shift as designated by supervisory staff.

Jones ("Jones"). Jones, among others, testified at trial to the multiple instances of abuse suffered at the hands of Appellant.

Following the nonjury trial, Appellant was convicted of intimidation of witness/victim,[2] terroristic threats,[3] simple assault[4] and official oppression.[5] A sentencing hearing was conducted on April 2, 2013, and Appellant was sentenced to an aggregated period of probation of twelve years, one year of which was to be served in a county intermediate punishment program. Appellant was also ordered to have no contact with the victim, undergo random drug screening, have a mental health evaluation, and to enroll in and complete anger management classes.

On April 10, 2013, Appellant filed post-sentence motions arguing that the evidence was insufficient to sustain the convictions and that the verdict was against the weight of the evidence. He further moved for a new trial based on after-discovered evidence in the form of surveillance tapes. By order entered September 5, 2013, the post-sentence motions were denied. Appellant filed a timely notice of appeal on September 6, 2013. Appellant and the trial court complied with Pa.R.A.P. 1925.

_____

[2] 18 Pa.C.S. § 4952(a)(1).

[3] 18 Pa.C.S. § 2706(a)(1).

[4] 18 Pa.C.S. § 2701(a)(3).

[5] 18 Pa.C.S. § 5301(1).

Appellant presents the following issue for our review:

I.     Did the trial court abuse its discretion in denying the Appellant's postsentence motion that the verdict was against the weight of the evidence insofar as the testimony of the alleged victim, who was the only eyewitness, was unreliable because he had a motive to fabricate his accusations, he did not initially report the alleged incidents, no evidence was presented corroborating the alleged victim's claims, however, evidence was presented indicating that it was not possible for the incidents to have occurred?

Appellant's Brief at 7 (verbatim).

Appellant argues that the case against him "is sheer speculation based upon circumstantial evidence." Appellant's Brief at 30. Appellant maintains that the convictions were contrary to the weight of the evidence and were supported only by "uncorroborated testimony of a criminal who had a motive to lie." *Id.* Appellant further asserts that the evidence presented at trial established that it was not possible for Appellant to have acted as described by Jones. *Id.* Appellant contends that during the shift when the alleged abuse took place, there were other corrections officers working in F-Block, and "not one prison employee or inmate stated that they witnessed the abuse, heard [Appellant] threaten Jones, or that they saw [Appellant] on F-Block on the dates and times when the abuse and threats purportedly occurred." *Id.* at 31. Conversely, Appellant claims, the character witness testimony presented by Appellant established that he had "an outstanding reputation for the care, custody, and control of inmates and in adhering to

and enforcing policies and rules." *Id.* at 34. Appellant argues that the evidence in this case was so weak that no reasonable or reliable inference of fact can be drawn supporting the verdict, and it is therefore against the weight of the evidence. *Id.* at 35. Appellant maintains that a new trial is warranted. *Id.* at 36.

The law pertaining to weight of the evidence claims is well-settled. Our Supreme Court has stated:

> A motion for a new trial alleging that the verdict was against the weight of the evidence is addressed to the discretion of the trial court. An appellate court, therefore, reviews the exercise of discretion, not the underlying question whether the verdict is against the weight of the evidence. The factfinder is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. The trial court will award a new trial only when the jury's verdict is so contrary to the evidence as to shock one's sense of justice. In determining whether this standard has been met, appellate review is limited to whether the trial judge's discretion was properly exercised, and relief will only be granted where the facts and inferences of record disclose a palpable abuse of discretion. Thus, the trial court's denial of a motion for a new trial based on a weight of the evidence claim is the least assailable of its rulings.

*Commonwealth v. Diggs*, 949 A.2d 873, 879–880 (Pa. 2008) (internal citations omitted).

Intimidation of a witness or victims is defined as follows:

> (a) **Offense defined.--** A person commits an offense if, with the intent to or with the knowledge that his conduct will obstruct, impede, impair, prevent or interfere with the administration of criminal justice, he intimidates or attempts to intimidate any witness or victim to:
>
> > (1) Refrain from informing or reporting to any law enforcement officer, prosecuting official or judge

> concerning any information, document or thing relating to the commission of a crime.

18 Pa.C.S. § 4952 (a)(1). Terroristic threats with the intent to terrorize another is defined as follows:

> **(a) Offense defined.--** A person commits the crime of terroristic threats if the person communicates, either directly or indirectly, a threat to:
>
> > (1) commit any crime of violence with intent to terrorize another;

18 Pa.C.S. § 2706(a)(1).

A person is guilty of simple assault if he attempts by physical menace to put another in fear of imminent serious bodily injury. 18 Pa.C.S. § 2701(a)(3). Official oppression is defined as:

> A person acting or purporting to act in an official capacity or taking advantage of such actual or purported capacity commits a misdemeanor of the second degree if, knowing that his conduct is illegal, he:
>
> > (1) subjects another to arrest, detention, search, seizure, mistreatment, dispossession, assessment, lien or other infringement of personal or property rights;

18 Pa.C.S. § 5301(1).

Jones testified in detail regarding Appellant's criminal conduct.[6] Jones testified that after arriving at SCIP, he proceeded through the medical

---

[6] In its opinion, the trial court indicates that the second volume of notes of testimony from the nonjury trial, containing the testimony of Randy Jones, was not filed and the trial court did not have access to it in preparing the
*(Footnote Continued Next Page)*

evaluation and was taken to the intake pod, "F-Block." N.T., 12/19/12, Vol. II, at 236-237. After being brought to F-Block, the officers lined the inmates up and Corrections Officers ("C.O.s") Harry Nicoletti ("Nicoletti") and Friess delivered an orientation speech. *Id.* at 237. During that speech, the C.O.s questioned the inmates about the nature of the charges against them. *Id.* at 237-238. Jones testified that at that time, he did not reveal to the C.O.s the basis of his conviction. *Id.* at 238. As he explained: "I made something up so that I would not have to be, you know, judged as a sex offender right on the spot." *Id.*

Jones provided the following detailed testimony regarding the abuse he began to experience on his third day at SCIP:

> [Commonwealth]: And what unusual happens on your third day at SCI Pittsburgh?
>
> [Jones]: I had an incident with a total of three different C.O.'s.
>
> [Commonwealth]: Well, let's start from the beginning.
>
> [Jones]: Okay.
>
> [Commonwealth]: What was the first unusual thing or what was the first thing you remember that started the unusual things that happened?
>
> [Jones]: Well, I remember C.O. Nicoletti was coming around for count.

*(Footnote Continued)* ───────────────────

Pa.R.A.P. 1925(a) opinion. We note that the certified record currently before us contains volume II of the notes of testimony from the nonjury trial and includes the testimony of Randy Jones. We have reviewed the testimony of Randy Jones, and the court's representation of Jones' testimony is accurate.

* * *

[Jones]:  I was – I was talking to my cellmate about a book he had, and I – I guess Mr. Nicoletti thought I was talking to him. So he stopped at my cell and he asked me my name.  I told him, he wrote it down and then continued on with count.

About five minutes later, five or ten minutes later, he called me down to the C.O. bubble on the intake pod and –

* * *

[Jones]:  I go to the doorway and Mr. Nicoletti asked me, you know, what my charges are.  So I tell him, you know, yes, I'm a sex offender, and he immediately jumps out of his seat, comes over, and hits me in the face, like, right on my left side of my face.

* * *

[Commonwealth]:  Continue on.  After Nicoletti strikes you, what occurs next?

[Jones]:  He tells me, you know, calls me a piece of shit, calls me all kinds of names, referring to sex offenders, and tells me, you know, that I don't even deserve to live, let alone ever get out of prison.

* * *

[Jones]:  He tells me to go back to my cell.  Once again, goes on name calling about, you know, sex offenders and –

* * *

[Jones]:  And then I comply with his order, and he told me, go back to my cell.

[Commonwealth]:  Okay.  So you go back to your cell and what occurs?

[Jones]:  I talked to my cellmate about what happened.  About 20 minutes after that, the trays come, and they collect them,

and then [C.O.] Nicoletti and [C.O.] Friess come to my cell. And they come into my cell, tell my cellmate to step outside, and they come in, and I'm laying down on my bed. They tell me to stand up and, once again, they start with name calling. C.O. Nicoletti hit me again.

* * *

[Jones]: He – he put a pair of handcuffs on, like, over his knuckles like they were brass knuckles, kind of. He, you know, he has Friess ask me about my charges, telling me to go into detail, going into more detail.

[Commonwealth]: About the nature of your charges? About the facts behind your charges?

[Jones]: Yes, sir.

[Commonwealth]: Do you comply with that?

[Jones]: Yes.

[Commonwealth]: As you're telling them the nature of your charges, what are they doing?

[Jones]: C.O. Friess steps out of the door and tells the inmates, like, in the cells around me what my charges are.

[Commonwealth]: He announces it to the other inmates, what your charges are?

[Jones]: Yes, sir.

[Commonwealth]: Continue on.

[Jones]: They – they move me down a couple cells down to a single cell.

* * *

[Jones]: [After leaving the cell], Nicoletti closes the door, locks it, and then spits on the floor and tells me I don't have to worry about him anymore, but the other C.O.'s and the other inmates I still have to worry about.

[Commonwealth]:  How long is it, Mr. Jones, before the next thing happens?

[Jones]:  About 15 to 20 minutes, maybe.

* * *

[Jones]:  The next thing to happen, [Appellant] came by my cell and stopped in my cell and said, I heard we got one that likes to fight.

[Commonwealth]:  Is [Appellant] inside or outside of your cell at this point?

[Jones]:  He's outside of my cell looking in the cell, like, the window of the door.

* * *

[Jones]:   [Appellant said I hear] I have one that likes to fight. And I'm telling him, no, I don't want to fight anybody, I just want to, you know, be by myself right now.

And he asked me, you know, are you a sex offender?  And I said, yeah, I – I did what my charges say I did.

And – one sec, I'm trying to  -- okay.  And he – he – I can't remember what exactly he does next.  I know he comes back.  He leaves and comes back with another inmate.

[Commonwealth]:  Can you describe this inmate?

[Jones]:  He's about 5'10", 5'11", 200 pounds.

[Commonwealth]:  White guy?  Black guy?

[Jones]:  White.

[Commonwealth]:   The first encounter you have, the conversation you have with [Appellant], does he enter your cell or open your door at all at that point?

[Jones]:  No.  He – he doesn't do it until –

- 10 -

[Commonwealth]: I'm sorry. That's fine. Just, so this second time, you see [Appellant]. What transpires this time?

[Jones]: He – he brings the inmate by and says, you know, the inmate claims to be gay and he – the inmate insults me about my charges. He claims he's going to rape me. Nicoletti – I'm sorry – [Appellant] says, you know, he does – he didn't say anything about that. He just laughs about it the whole time while this inmate's going on and on about it.

[Commonwealth]: Is your door opened this time?

[Jones]: No. Still closed.

[Commonwealth]: You're still looking at them through the window, or they're looking at you through a little window in your cell?

[Jones]: Yes. And they – they come back again with another inmate.

[Commonwealth]: Who comes back again?

[Jones]: [Appellant] and the first inmate.

[Commonwealth]: All right. And now they have a third inmate?

[Jones]: Yes.

[Commonwealth]: Can you describe this inmate to the Court?

[Jones]: All I know, he was a black guy how – he said his name. His nickname was Dutch. Claimed to be the first one's boyfriend.

[Commonwealth]: And do you have any conversation, or does this Dutch say anything to you?

[Jones]: He says that I have to look out for him and his – his boyfriend in the shower in the morning. They were going to rape me and they were going to bring their shank with them.

[Commonwealth]: Is your door opened on this third occasion?

- 11 -

[Jones]:  No.

[Commonwealth]:  What's the next thing you remember happens, Mr. Jones?

[Jones]:  [Appellant] comes back by himself and pops my door.

* * *

[Jones]:  [Appellant] comes in and puts a pair of black gloves on his hands and says, you know what these are for; right?

I shook my head no.  He says, so I don't leave handprints or bruises.  He said – he claimed he was 52 and 0 or something like that in fights on the F-Block.

He said, it's normally business but this time it's going to be for fun.  And he pushed me back towards the back of my cell and hit me in my stomach.

[Commonwealth]:  Does he hit you with open hand or closed hand?

[Jones]:  A fist right in the center of my stomach.

[Commonwealth]:  How much force does he use to hit you in the stomach?

[Jones]:  Enough that it – it hurt.  He's berating me about my charges, going on and on about me being a sex offender, and he hits me again with a closed fist in the center of my chest, which took the wind out of me for a few seconds.  I couldn't breathe and I – I explained to him, you know, I'm asthmatic.  Just, you know, if you hit me like that, that could end up killing me.

And he said, okay, how about this?  And punches me with a closed fist right in the center of my forehead with enough force to hurt me (indicating).

[Commonwealth]:  Are you standing or sitting when this occurs?

[Jones]:  I'm standing in the back of my cell.

[Commonwealth]: And is he blocking the only escape from the cell?

[Jones]: Yes.

[Commonwealth]: After you're struck the third time, what happens between you and [Appellant]?

[Jones]: He – he's still going on about my charges and he – he leaves the cell, closes the door, walks away, and about a couple minutes later, maybe two or three minutes later, comes back and says, listen, Jones, if you tell a white-shirt about this, I'll make your life a nightmare you won't be able to wake up from.

[Commonwealth]: And in jail lingo, Mr. Jones, what is a white-shirt?

[Jones]: Lieutenant or a captain.

[Commonwealth]: Did you take that threat seriously?

[Jones]: Yes, I did.

[Commonwealth]: Does anything else occur that evening?

[Jones]: No, not that evening.

[Commonwealth]: The next day, do you put any request in?

[Jones]: Yes. I – I asked to, in the morning, the – the morning time C.O., I asked, you know, put me in protective custody. He asked me why. I told him, you know, I'm getting threatened by everybody. I just, I don't feel safe out here.

[Commonwealth]: Did you mention the incident with Mr. Nicoletti?

[Jones]: No.

[Commonwealth]: And why is that?

[Jones]: Because I took what [Appellant] said serious. I – I didn't know what he would do to me if I told.

[Commonwealth]:  Are you granted protective custody?

[Jones]:  Yes.  They moved me over the Restricted Housing Unit.

[Commonwealth]:  And does the incident that you testified to with Mr. Nicoletti and [Appellant], if that would have been on the 30th, would that now be December 31st that you're taken into protective custody?

[Jones]:  Yes.

[Commonwealth]:  Does anything occur while you are in protective custody?

[Jones]:  Yes.  It was on January 1st.

[Commonwealth]:  The second day you're in protective custody?

[Jones]:  Yes, sir.

[Commonwealth]:  New Year's Day?

[Jones]:  Yes.  [Appellant] came up to my cell in the RHU.

* * *

[Jones]:  [Appellant] asked me if I – I told anybody about what happened, and I told him no.  And he – he listed other inmates in the RHU know that I'm a sex offender.

And as he's walking away, he calls me a little pedophile bitch, and he leaves the – leaves the housing unit. And it was two days after that, on the 3rd, he came back again.

* * *

[Commonwealth]:  So on the 3rd, you now request that you are able – or you requested you be allowed to take a shower?

[Jones]:  Yes.

[Commonwealth]:  And what transpired?

[Jones]:  They told me I have to wait until two to ten [shift] comes in.  That's the second shift of the C.O.'s.  So I say okay.

And two to ten comes in.  I asked for a shower again.  They told me I have to wait.  And then [Appellant] comes up to my cell holding a pair of handcuffs over his hands like brass knuckles and tells me – he asked me if I wanted to shower, and I say yeah.  He says, well, you know, you know [sic] I'll be the one cuffing you up?  So I refused the shower.

[Commonwealth]:  Why did you refuse a shower?

[Jones]:  I thought I was going to be attacked again.

[Commonwealth]:  Is [Appellant] inside or outside of your cell at this point?

[Jones]:  Outside.

[Commonwealth]:  And while you're in the RHU, does he ever come inside the cell?

[Jones]:  No.

[Commonwealth]:  So what's [Appellant's] response when you say, I'm not taking a shower now?

[Jones]:  He yells down that I refused my shower.  And as he's walking away, calls me a smelly little bitch and leaves the housing unit.

[Commonwealth]:  Is that your last encounter with [Appellant]?

[Jones]:  Yes.

N.T., 12/19/12, Vol. II, at 240-256.

Thus, the testimony provided by Randy Jones supports Appellant's above-referenced convictions.  In addition to Randy Jones' testimony,

- 15 -

Corrections Officer Curtis Hoffman ("Hoffman") provided corroborating testimony.[7] Hoffman supervised the first tier of F-Block at the time Randy Jones was incarcerated. N.T., Vol. II, 12/19/12, at 348-350. Hoffman worked the 2:00 pm to 10:00 pm shift in December of 2010. *Id.* at 349. It was Hoffman's testimony that C.O. Nicoletti took it upon himself to give an orientation speech to new inmates. *Id.* at 352. Hoffman testified that through these orientation speeches, C.O. Nicoletti would attempt to single out sex offenders. *Id.* at 355. C.O. Nicoletti would announce the person's charges to the rest of the block. *Id.* at 356. Hoffman testified that designating an inmate as a sex offender would put that inmate in danger. *Id.* at 356.

Hoffman further testified that Appellant would attend C.O. Nicoletti's orientation speeches at F-Block. *Id.* at 354. Appellant would often enter the F-Block for the purpose of aggravating inmates and bragged about abusing inmates.

> [Commonwealth]: Other than [Appellant] doing his job and transporting the new inmates to F-Block, did you ever see - - and I'll try to keep it focused on or about December of 2010 - - [Appellant] on F-Block at other times?
>
> [Hoffman]: Yes.

---

[7] The trial court indicates in its opinion that the transcript of Hoffman's testimony was also unavailable to it. Trial Court Opinion, 2/11/15, at 6 n.1. As noted previously, volume II of the notes of testimony is currently part of the certified record and available for our review.

[Commonwealth]: And can you tell His Honor what observations you made of [Appellant] being on F-Block at other times?

[Hoffman]: He would come on the block first when Officer Nicoletti was there and approach different cells, especially cells - - those of child - - people accused of sex crimes.

* * *

[Commonwealth]: Would there be any legitimate reason for [Appellant], a yard worker, to go into a tier of a – sorry into a cell of a quarantined inmate?

[Hoffman]: Aside from relief, no.

[Commonwealth]: And what do you mean by relief, Mr. Hoffman?

[Hoffman]: If he was there to relieve that officer for any reason, if the officer had to go to training, you know, be seen by the captain, et cetera. For any other reason, no.

[Commonwealth]: Did you ever see [Appellant] go into cells of inmates who were quarantined?

[Hoffman]: Yes.

* * *

[Commonwealth]: The answer to the question, did you see [Appellant] go into cells, was yes?

[Hoffman]: Yes.

[Commonwealth]: I know you probably wouldn't have counted them, but was this a one-time thing or did it happen numerous times?

[Hoffman]: Numerous.

[Commonwealth]: Is there anyone that [Appellant], would sort of accompany while on F-Block when you saw him go into other cells?

[Hoffman]: Officer Nicoletti.

* * *

[Commonwealth]: How many times - - have you ever asked [Appellant] to leave F-Block?

[Hoffman]: Yes. I told him to stay off my tier. He was upsetting the inmates and I had to deal with them.

[Commonwealth]: Approximately how many times did you do that?

[Hoffman]: On two occasions.

[Commonwealth]: Have you ever been present when [Appellant] talked about how he treats or how he feels about inmates?

[Hoffman]: Yes.

[Commonwealth]: Can you tell His Honor what sort of statements [Appellant] would make about inmates, and inmates of convicted sex crimes, specifically?

[Hoffman]: One statement stood out in particular. Do you know why I wear these fucking blue contacts? It's because it intimidates these goddamn inmates.

He would talk - - I deliberately would steer clear of [Appellant] in his conversations and try, but it was almost impossible. He bragged a lot about, you know, his escapades, especially, you know, what he said to inmates, you know, beat this, do this. And he always talked about physically, you know, fighting.

[Commonwealth]: Would he brag about beating up inmates?

[Hoffman]: Yep, yes.

[Commonwealth]: Was he almost proud of the fact, boasting that he would beat pedophiles?

[Hoffman]: Yes.

- 18 -

[Commonwealth]: How often would this occur?

[Hoffman]: Almost every time I came into contact with him.

N.T., 12/19/12, Vol. II, at 356-362.

Furthermore, the Commonwealth introduced testimony from other inmates, demonstrating Appellant's pattern of abusive behavior and corroborating the testimony of Randy Jones and C.O. Hoffman. Inmate James Turner ("Turner") testified that after he arrived at SCIP, he was taken to F-Block. N.T., Vol. 1, 12/17/19, at 156. C.O. Nicoletti gave an orientation speech, and then questioned Turner regarding his charges. *Id.* at 156-157. Turner acknowledged that he was convicted of a sex offense. *Id.* at 157. Officer Nicoletti and two other C.O.s verbally berated Turner regarding those charges. *Id.* at 157-159. Turner testified to the following interaction with Appellant that occurred after he was taken to his cell following the orientation speech:

> [Commonwealth]: What did [Appellant] first do? Or what's the first thing that happens, interaction between you and [Appellant]?
>
> [Turner]: The first interaction, he came into the cell, tried to turn on the – the light in my cell, and he noticed that it wasn't turning on, and he asked me, why doesn't my light work. And I said that -- that one of the other inmates tried to light a cigarette and blew the circuit breaker out.
>
> [Commonwealth]: Continue on, sir. What happens next?
>
> [Turner]: Then he - - I was standing up in front of the desk, and with a closed fist, [Appellant] also hit me in my chest and knocked me back into my bunk with my head off the wall.

- 19 -

[Commonwealth]: Did that cause you to have substantial pain?

[Turner]: Some, yes.

[Commonwealth]: What occurs after you're struck by [Appellant]?

[Turner]: After he had done that, he had grabbed me by my shirt collar and got up in my face and started verbally - - basically, verbally abusing me.

[Commonwealth]: Do you recall what the nature of the abuse was?

[Turner]: Basically saying that I'm a piece of shit and I don't deserve to live and stuff like that.

[Commonwealth]: Was there any discussion as to what would happen if you told someone about what was transpiring?

[Turner]: Yes. He did say that if I said anything to anybody, that he would be back to basically splatter my blood all over the cell.

[Commonwealth]: Are those his words or are those your words?

[Turner]: Those are his.

* * *

[Commonwealth]: Did you have any further interactions with [Appellant] while you were at SCI Pittsburgh?

[Turner]: Yes. One other time after I got moved upstairs.

[Commonwealth]: You were moved – - what tier were you on when this first incident happened?

[Turner]: It was the – the lower level.

[Commonwealth]: And where were you moved to? What tier?

[Turner]: It would be Tier 2.

- 20 -

[Commonwealth]: And can you tell His Honor what occurred between you and [Appellant] when you were on Tier 2?

[Turner]: [Appellant] had come back, he was walking around and had said that - - asked me what am I doing up here on this, on this tier, and I told him that this is where they had stuck me.

[Commonwealth]: Is that the only conversation or was there more conversation?

[Turner]: Well, a short time later, he had come back to my cell. I'm presuming [he] was by himself because he said that he didn't have any lookouts or anything. He came into my cell while I was lying on my bunk in the cell by myself. He had walked up to my bunk, and the first thing he did was punch me in the side of my face, in my temple.

[Commonwealth]: Do you know if it was with a closed hand or an open hand?

[Turner]: Felt like a closed hand.

[Commonwealth]: Did he make any statements to you before or after he struck you?

[Turner]: After he had struck me, he had asked me if I wanted to hit him back, and at that time I had told him no.

N.T., 12/17/12, Vol. I, at 160-163.

William Zuschlag was also an inmate at SCIP Pittsburgh. N.T., 12/19/12, Vol. II, at 301. Zuschlag maintained that on his second day at SCIP, while he was housed on the bottom floor of F-Block, he was assaulted by Appellant. *Id.* at 301-302. Zuschlag provided the following testimony regarding his interactions with Appellant:

[Commonwealth]: So let's go with the second day. What do you first remember that was unusual about the second day?

- 21 -

[Zuschlag]: [Appellant] come [sic] up to my cell. He started asking me a bunch of questions like, you know, what I was in jail for, et cetera, et cetera, et cetera. And that's when the assaults started.

[Commonwealth]: Did you answer [Appellant] when he asked you what your charges were for?

[Zuschlag]: Yes.

[Commonwealth]: Was - - how did [Appellant] gain entry to your cell, if you know?

[Zuschlag]: He had a key and unlocked the cell door.

[Commonwealth]: Can you tell His Honor what transpired when [Appellant] entered your cell?

[Zuschlag]: When he entered my cell, he come [sic] up to me. He said, I hear you like to touch little kids. And I explained to him that that's not the truth. I told him that I had a victim of 16 years of age, and he continued to question me about these things.

And he also stated to me that I was lucky that it was a girl of that age or I would have been hurt worse, like my buddy, the pedophile next door to me.

[Commonwealth]: Was he referring to James Turner at that point?

[Zuschlag]: Yes, he was.

[Commonwealth]: Okay. You say, then, an assault occurred?

[Zuschlag]: Yes.

[Commonwealth]: Can you tell His Honor how that occurred?

[Zuschlag]: He come into the cell, like I said, started talking to me, asking me questions. Then he picked me up like this (indicating) by my shirt.

[Commonwealth]: And you're indicating both hands around your collar?

[Zuschlag]: Yes. And he started pushing me up against the wall. Well, actually, I was sitting on the - - the bed, and he slammed me up against the wall, and the back of my back hit the wall. My head hit the wall.

Then he - - he picked me up, put me up on my feet, turned me around, and slammed me up against the wall in the cell. Held me there for a couple of seconds, yelling at me different, you know, nasty things, like I'm a piece of shit and, you know, piece of garbage, you need to die, blah, blah, blah. Stuff like this.

And he - - after he was done with that, he threw me down on the floor in the cell and he kicked me. Then he picked me back up once again by my shirt collar and placed me on the bed and he says, I'll be back to see you again, and he left the cell.

[Commonwealth]: Could you tell where he went after he left your cell?

[Zuschlag]: Yes. He went to James Turner's cell is next to mine.

[Commonwealth]: I take it you can't see what is occurring in the cell next to you?

[Zuschlag]: I could see a little bit, but I was really too afraid to go to the door because, you know, I knew to see the C.O.'s gone in there and what they were doing with him, and I was too terrified to go near the door.

[Commonwealth]: Did you hear anything from next door?

[Zuschlag]: Yeah. I heard, you know, thumps. Like, you know, a body hitting the wall or something like that, and I heard James say, please don't hurt me.

[Commonwealth]: Did Appellant say anything to you before he left your cell?

[Zuschlag]: On which occasion?

[Commonwealth]: This first occasion. Let's just stick with this first occasion.

[Zuschlag]: First occasion, yeah. He just said he'd be back. That's all he told me. And he said to me also, if I said anything about this to anyone or brought it to anyone's attention, he would splatter my blood all over the cell.

[Commonwealth]: Did you take that comment seriously?

[Zuschlag]: Yes, I did.

N.T., 12/19/12, Vol. II, at 303-306. Zuschlag also testified to a second, similar assault by Appellant that occurred the next day. *Id.* at 307. The abuse continued for the entire week he was on the first floor. *Id.* Zuschlag also testified to continuing abuse by Appellant, during the 2:00 pm to 10:00 pm shift, even after Zuschlag was transferred to the second tier. *Id.* at 309. During the instances of physical abuse, Appellant would wear black gloves. *Id.* at 310.

The trial court provided the following analysis regarding Appellant's claim:

In reviewing the testimony in this matter this Court found Jones to be a credible witness and that Hoffman provided testimony that supported Jones' claim that he had been assaulted even though Hoffman did not see any of the physical assaults. Hoffman's testimony that [Appellant] was frequently on F Block when he had no business being there was circumstantial evidence of the fact that [Appellant] had committed these crimes.

* * *

In addition to the testimony of Jones and Hoffman, this Court had [Appellant's] work schedule, a calendar depicting when the

- 24 -

various inmates [Appellant] was accused of abusing were at SCI Pittsburgh, information as to [Appellant's] job as a utility officer, the fact that none of his responsibilities as a utility officer required him to be on F Block, and the fact that [Appellant] reported to work early to use the gym facilities and would be in his street clothes as opposed to his corrections officer uniform. This Court weighed all of those factors in making an assessment of credibility and found both Jones and Hoffman to be credible, which substantiated the charges that were filed against him.

Trial Court Opinion, 2/11/15, at 6-7.

The trial court's discussion is supported by evidence of record. As referenced, Appellant contends that Jones was an incredible witness. We first note that this Court has stated that a new trial is not warranted based on a mere assertion of "a reassessment of the credibility of witnesses." *Commonwealth v. Gonzalez*, 109 A.3d 711, 723 (Pa. Super. 2015). The trial court, as finder of fact, credited Jones' testimony. Thus, we agree with the trial court's conclusion that Appellant's claim that the verdicts in this case were against the weight of the evidence lacks merit.

Additionally, Appellant's claim that no testimony corroborating Jones' claims was introduced at trial is belied by the record. As outlined above, there was significant evidence of record introduced at trial that corroborated Jones' claims and established Appellant's abusive behavior pattern. Thus, we do not find the verdicts so contrary to the evidence as to shock one's sense of justice and discern no abuse of discretion by the trial court.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/25/2015